1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                              * * *
6   BRANDSAFWAY SERVICES, LLC,              Case No. 3:20-cv-00362-MMD-CLB
7                          Plaintiff,
                                            ORDER
8       v.
9   LABORERS' INTERNATIONAL UNION OF
10  NORTH AMERICA, LOCAL 169,
11                         Defendant.
12

13  **I.    SUMMARY**

14          Plaintiff BrandSafway Services, LLC ("BSS"[1]) seeks declaratory relief that it is not

15  a party to any collective bargaining agreement with Defendant Laborers' International

16  Union of North America, Local 169 ("Local 169"). (ECF No. 43 at 2.) Before the Court are

17  the parties' cross-motions for summary judgment to resolve the dispositive issue of

18  whether a valid contract exists between BSS and Local 169. (ECF Nos. 42[2] ("BSS's

19  Motion"), 43[3] ("Local 169's Motion").) Because the Court is persuaded that BSS presents

20  the correct view of the legal relationship between the parties—and as further explained

21  below—the Court will grant BSS's Motion and deny Local 169's Motion.

22  ///

23  ///

_____

[1]The Court notes that BSS, at least in name, succeeds the following companies: "Fred Perry Sportswear Inc.," "Safway Steel Products, Inc.," "Safway Services, Inc.," "Thyssenkrupp Safway, Inc.," and "Safway Services, LLC." (ECF No. 42-1 at 97-99.) Unless stated otherwise, the Court will generally refer to BSS and all its predecessors as "BSS" throughout the order.

[2]The Court reviewed the parties' response and reply. (ECF Nos. 45, 49.)

[3]The Court reviewed the parties' response and reply. (ECF Nos. 47, 48.)

## II.    BACKGROUND

The following facts are undisputed unless otherwise noted. On July 16, 2018, Local 169 renewed a prior collective bargaining agreement with the Nevada Chapter of the Association of General Contractors ("Nevada AGC"), an association comprising several member companies in several states, including Nevada. (ECF No. 7-6 at 6.) Before signing the Agreement, Local 169 sent written notice to BSS's predecessor "Safway Services, LLC," an alleged signatory to the predecessor 2015-2018 collective bargaining agreement between Local 169 and Safway Services, LLC ("Laborers' Master Agreement" or "LMA"). (ECF No. 42-1 at 29.) That notice, dated May 11, 2018, stated that Safway would be bound by the terms of the new LMA unless it rendered timely written notice per Section 39 of the 2015-2018 LMA. (*Id.*) On May 18, 2018, Local 169 sent another letter to BSS, explaining that the first meeting for multi-employer bargaining negotiations under the LMA had been rescheduled. (*Id.* at 31.)

During this same time period, BSS changed its name from "Safway Services, LLC" to "BrandSafway Services LLC," effective June 1, 2018. (ECF Nos. 42 at 6, 42-1 at 33.) Additionally, on May 21, 2018, BSS became a signatory to a National Maintenance Agreement[4] ("NMA") with Laborers' International Union of North America ("LiUNA")—a national union of which Local 169 is a member. (ECF No. 43-13 at 2.) In its NMA acceptance letter to BSS, LiUNA states that "the signatory contractor must perform work under the applicable local building trades agreement in the event that a request for the extension of their NMA is not received and approved by this office prior to the contractor beginning another job." (*Id.*)

---

[4]Under the NMA with a national union, a signatory contractor may hire for work within a local union's jurisdiction without having to enter a contractual relationship with the local union. (ECF No. 42 at 14 n.3.) A contractor signatory to the NMA contracts with the national union and must hire union members for work that is not covered by a local union's area collective bargaining agreement (*e.g.*, an LMA). (ECF Nos. 43 at 4, 43-4 at 3.) The National Maintenance Agreements Policy Committee, Inc. ("NMAPC") oversees the national NMA program, and each participating national union may deny or approve a signatory contractor's request for a site extension of the NMA. (ECF No. 43-13 at 2.)

BSS was a signatory contractor under the NMA with LiUNA for at least one previous project, for which it used Local 169 members' labor. In March 2006, BSS gained LiUNA's approval for an NMA site extension request to hire 25 Local 169 members for scaffolding work at the Valmy Power Plant ("Valmy") project. (ECF No. 45-3 at 2-3.) At the same time, BSS also gained the national carpenters' union's approval of a site extension request under their respective NMA to hire 25 local carpenters for the same scaffolding work at the Valmy project. (ECF No. 42-1 at 79-80.) However, one year earlier, in March 2005, LiUNA denied BSS's site extension request to hire four Local 169 members for the Barrick Gold Mine ("Barrick") project, "due to contractor [BSS] not returning a signed [ ] Agreement. If you still wish to become signatory to the NMA with L[i]UNA, please contact" the national union. (ECF No. 42-1 at 75.) Nevertheless, Local 169 members eventually did perform work at the Barrick project after March 2006.[5] (ECF Nos. 42 at 7, 43 at 4, 42-1 at 38-42.)

On June 1, 2018, BSS sent a response letter, confirming receipt of both letters from Local 169 and stating that it had not recently bargained with Local 169 and would refuse to bargain in the future:

> Please be advised that Safway hasn't employed members of Local 169 for several years and, in any event, the Safway branch in Salt Lake ceased operations and permanently closed as of November 30, 2017. Therefore, Safway declines to recognize or bargain with the union for any successor agreement. Safway also does not authorize any third party, such as a multi-employer bargaining representative or association, to bargain or enter into any agreements on Safway's behalf.

(ECF No. 43-20 at 2.)

These two letters from Local 169 are among several notice letters Local 169 sent BSS. In 2008 and 2011, Local 169 sent letters to "[a]ll contractors signatory to the Laborers' Master Agreement," including BSS, providing written notice about upcoming wage and benefits increases. (ECF No. 42-1 at 86-90, 92-95.) Local 169 sent BSS three

---

[5]As explained below, the parties disagree as to whether an LMA with Local 169 or the NMA with LiUNA governed the work the Local 169 members performed at Barrick.

1   additional letters in 2011, 2013, and 2015, giving notice of Local 169's intent to re-open
2   multi-employer negotiations under the LMA with the Nevada AGC. (*Id.* at 23-27.) Local
3   169 warned BSS in the 2011 and 2013 letters that "[t]his notice to negotiate with respect
4   to wages and benefits does not terminate [the signatory contractor's] obligations under
5   this agreement or any successor to this agreement." (*Id.* at 23, 25.) In the 2015 letter,
6   Local 169 warned BSS that its "acquiescence by virtue of this notice shall constitute an
7   affirmative act of recommitment to multi-employer bargaining, binding your company to
8   the terms of any successor agreement . . ." (*Id.* at 27.)

9       Eventually, on August 1, 2019, Local 169 sent BSS a grievance letter ("First
10  Grievance"), alleging BSS failed to comply with the terms of the LMA by hiring workers in
11  violation of their exclusive contract. (ECF No. 15-4.) BSS responded, denying that it was
12  party to any agreement with Local 169. (ECF No. 15-5.)

13      On October 2, 2019, Local 169 sent BSS a second grievance letter ("Second
14  Grievance") seeking recognition of BSS's obligation to comply with the LMA. (ECF No.
15  15-6.) BSS again responded that it would not submit to the grievance and arbitration
16  process because it was not a party to the LMA. (ECF No. 15-7.)

17      BSS next filed an Unfair Labor Practice charge with the National Labor Relations
18  Board on November 12, 2019, regarding BSS's right to contract with workers who were
19  not members of Defendant Local 169. (ECF No. 15-10.) At the NLRB hearing, which
20  took place on February 18, 2020, Local 169 stated that the First Grievance was no
21  longer pending against BSS or any employer. (ECF No. 15-13 at 18.) The only remaining
22  question was therefore "whether or not there is an agreement between BrandSafway
23  and the Laborers." (*Id.* at 19.) The NLRB found there was no valid agreement.[6] (ECF No.
24  15-16 at 5.)

25

26      [6]The NLRB found "no evidence that Local 169 has a collective bargaining
    agreement with the Employer covering the work in dispute. Although Local 169 asserts
27  that the Employer is bound to the [LMA] as a successor to Safway Services, LLC, Local
    169 has failed to establish that Safway Services was itself bound to the LMA." (ECF No.
28  15-16 at 5.)

All the while, Local 169 continued to seek arbitration of the Second Grievance. (ECF Nos. 15-12, 15-14, 15-15.) Despite their disagreement about the authority of an arbitrator to enforce the LMA against BSS, the parties subsequently moved forward and scheduled an arbitration on the Second Grievance. (ECF No. 15-12.) On November 22, 2019, BSS agreed via email to "participate" in the arbitration:

> subject to the following objections: (1) the Company is not party to an agreement with Laborers Local 169 and, therefore, the Company is not legally bound to resolve this dispute in accordance with the terms of any such agreement, nor can the Company be compelled to submit any dispute to arbitration; (2) the arbitrator lacks jurisdiction and authority to decide the issues of whether there exists an agreement to arbitrate and whether the Company is legally bound to arbitrate; and (3) the Company expressly reserves its right to have that issue determined by a court of competent jurisdiction.

(*Id*. at 2.) Three months later, BSS informed Local 169 and the arbitrator that it "does not consent to arbitration . . . will not appear for a hearing . . . and will not agree to submit any issue to an Arbitrator for resolution." (ECF No. 15-14.) BSS reiterated its position that "whether a contract between the Parties exists . . . is an issue that may only be determined by a federal court of law, and is not subject to arbitration." (*Id.*) This lawsuit followed.

BSS initially asked the Court to declare—in pertinent part—that it is not a party to any agreement with Local 169. (ECF No. 1.) BSS then moved to preliminarily enjoin arbitration on this issue. (ECF No. 2.) Local 169 responded with a competing motion to compel arbitration (ECF No. 7) and motion to stay this case pending the Court's resolution of the motion to compel (ECF No. 8). The Court denied all three motions and deferred for another day the issue of whether an LMA or any other valid contract exists between the parties. (ECF No. 18.)

As the lawsuit proceeded through discovery, Local 169 revealed that it had found a "Short Form Agreement" between Local 169 and "Safway Steel Products," dated September 2, 1969, with an accompanying letter (collectively, "1969 Short Form Agreement"), dated September 6, 1969. (ECF No. 43-34.) Officers of Safway Steel Products appear to have signed both the Short Form Agreement and accompanying

letter. (*Id.*) Richard Daly, Local 169's business manager, found these documents in Local 169's files, but only after repeatedly stating in his deposition that Local 169 did not possess any signed documents indicating a valid contract between Local 169 and BSS or any of BSS's predecessors. (ECF Nos. 43 at 10-11, 43-5 at 3, 8, 9-10, 30-31, 48 at 5.)

After discovery closed, both BSS and Local 169 filed cross-motions for summary judgment (ECF Nos. 42, 43) on the sole issue of whether BSS is bound to an LMA or any other collective bargaining agreement with Local 169.

### III.   LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, *et al.*, *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)) (citations omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV.   DISCUSSION

The Court addresses both motions together below because, as noted, both ask the Court to answer the same ultimate question. The cross-motions also require the Court to address two evidentiary issues involving the 1969 Short Form Agreement before it resolves the remaining issues presented in the parties' motions. The Court will thus first determine whether the 1969 Short Form Agreement is inadmissible as an unauthenticated document and as hearsay and, if it is hearsay, whether the document is otherwise admissible as a business record under Federal Rule of Evidence 803(6). For the reasons explained below, the Court rejects BSS's argument that the 1969 Short Form Agreement should be excluded due to lack of authentication, but agrees that the document is inadmissible hearsay and does not fall within the business record exception.

Therefore, the Court will not consider it for summary-judgment purposes. Then, having ruled it will not consider the 1969 Short Form agreement, the Court will address the parties' arguments as to whether a valid contract otherwise exists between them. To preview, the Court finds there is no valid contract between the parties.

### A.    Threshold Evidentiary Issues

As noted, BSS argues that the 1969 Short Form Agreement is inadmissible because it is: (1) not properly authenticated; and (2) inadmissible hearsay. (ECF Nos. 45 at 10-13, 48 at 4-6.) Local 169 counters that the document is admissible as a properly authenticated business record and asks the Court to consider it for summary-judgment purposes. (ECF Nos. 47 at 3-4, 49 at 9-14.) The Court addresses both evidentiary arguments, in turn, below.

### 1.    Authentication

BSS relies exclusively on the standard set forth in *Orr v. Bank of America* to argue the 1969 Short Form Agreement is not properly authenticated, which strictly requires evidence to be properly authenticated and admissible in its present form for it to be considered at the summary-judgment stage. (ECF No. 43 at 8, 14 (citing *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002)).) However, the 2010 amendments to Federal Rule of Civil Procedure 56 "eliminate[d] th[is] unequivocal requirement" and mandate only that the substance of the proffered evidence would be admissible at trial. *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016); *see also* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Accordingly, the Court will not, as BSS requests, disregard the 1969 Short Form Agreement solely for lack of proper authentication because its substance could be admissible at trial. For example, Daly could testify as to where he found the document and what it is.

### 2.    Hearsay

That brings the Court to BSS's hearsay objection. (ECF No. 45 at 12-13.) Federal Rule of Civil Procedure 56(c)(2) states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in

evidence." Rule 56(c)(2) objections "function much as an objection at trial . . . The burden is on the proponent to show that the material is admissible as presented." Fed. R. Civ. P 56(c)(2), advisory committee's note to 2010 amendments; *see also Fed. Trade Comm'n v. AMG Servs., Inc.*, Case No. 2:12-cv-00536-GMN-VCF, 2014 WL 317781, at *12 (D. Nev. Jan. 28, 2014). Accordingly, the Court first addresses whether the 1969 Short Form Agreement is hearsay and then determines whether an exception to the hearsay rule applies.

### a.      Whether the 1969 Short Form Agreement is hearsay

As noted, BSS argues that the 1969 Short Form Agreement is inadmissible hearsay. (ECF No. 45 at 12-13.) Rule 801(c) defines "hearsay" as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). In turn, Rule 802 states that hearsay is inadmissible unless an exception applies. *See* Fed. R. Evid. 802. Here, Local 169 proffers the 1969 Short Form Agreement and thus bears the burden of proving that the document is admissible. *See* Fed. R. Civ. P 56(c)(2), advisory committee note to 2010 amendments.

The Court finds that the 1969 Short Form Agreement is hearsay. The 1969 Short Form Agreement and its accompanying letter (ECF No. 43-34) are both signed by officers of "Safway Steel Products[,]" who are of course not testifying at a trial or hearing, and contains a written agreement that Local 169 offers for the truth of the matter asserted, *i.e.*, that the 1969 Short Form Agreement is a valid contract that "remains in full force and effect" and binds BSS as successor of "Safway Steel Products." (ECF No. 42 at 16-17.)

### b.      Whether the 1969 Short Form Agreement is admissible under Rule 803(6)'s business-record exception

Having found that the 1969 Short Form Agreement is hearsay, Local 169 next argues that the document is nevertheless admissible under Rule 803(6)'s business-

record exception.[7] (ECF No. 49 at 10-12.) Under this exception, if the proponent establishes that the evidence is admissible as a business record, "then the burden is on the opponent to show that the source of information or the method of circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6), advisory committee's notes, 2014 amendments. The Court has "wide discretion" in deciding whether evidence satisfies Rule 803(6)'s "trustworthiness standard." *See United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999).

The Court exercises its discretion to find that the 1969 Short Form Agreement does not satisfy Rule 803(6) and is therefore inadmissible. The circumstances under which Local 169 proffers the 1969 Short Form Agreement cast doubt on its authenticity and trustworthiness. *See* Fed. R. Evid. 803(6)(D)-(E) & 902(11).

Local 169 contends that it kept the 1969 Short Form Agreement at its office "in the normal course of business" in a separate folder designated for "Safway Steel Products," BSS's alleged predecessor. (ECF No. 49 at 11-12.) As support, Local 169 proffers a declaration by Richard Daly, Local 169's business manager and custodian of records. (*Id.* at 10-12, 49-1.) BSS challenges the document's trustworthiness because Local 169 produced the "50-year-old document" "on the eve of the close of discovery," after Daly stated numerous times during his deposition that Local 169 had no signed documents indicating a valid contract between the parties. (ECF No. 43 at 10-11.) Implicitly, BSS argues that the 1969 Short Form Agreement is forged, fake, or otherwise unreliable.

In response, Daly explains his contradictory statements and why he did not know about the 1969 Short Form Agreement until after his deposition. (ECF No. 49-1 at 2-3.) During the deposition, Daly first learned that BSS was a successor of contractors named

---

[7]Other exceptions to the hearsay rule may also apply here, such as the exception allowing authenticated "ancient documents" under Rule 803(16). *See* Fed. R. Evid. 803(16). But the Court does not address these other exceptions because Local 169— who bears the burden of proof as to hearsay exceptions—does not argue that they apply. (ECF No. 49 at 9-14.) *See also Wright and Miller*, Introduction to Rule 803 and General Principles, 30B *Fed. Prac. & Proc. Evid.* § 6803 (2022 ed.) ("The proponent of the [hearsay] statement, however, bears the burden of proving each element of a given exception or exclusion.") (internal quotation marks omitted).

"Safway Steel Products" and "Safway Services, LLC" when he observed an exhibit presented by BSS's attorney (*Id.* at 2-3.) This observation "alerted" Daly that "BSS was a successor to Safway Steel Products," the company that signed the 1969 Short Form Agreement. (*Id.* at 2.) After the deposition, Daly went to Local 169's office, searched the union's records relating to Safway Steel Products, and found the signed 1969 Short Form Agreement. (*Id.*) Daly then filed two declarations as custodian of records to authenticate and certify the document as a business record. (ECF Nos. 47-2 at 4, 49-1 at 1, 2-3.) Daly attributes his ignorance and late discovery of the agreement to Local 169's filing system that "only keeps files on individual contractors, and has not combined files if there is a successor contractor." (ECF No. 49-1 at 1.) In other words, Local 169 kept the 1969 Short Form Agreement in a folder for "Safway Steel Products," separated from "Safway Services LLC," BSS's immediate predecessor. (*Id.*)

Despite all this explanation, Local 169 offers little clarity as to who created the 1969 Short Form Agreement or how it was kept in the ordinary course of Local 169's regularly conducted activities. *See* Fed. R. Evid. 803(6)(A)-(B). Although a typical "Short Form Agreement" like the 1969 Short Form Agreement "is typically what [Local 169 has] on file for contractors," no such document exists in BSS's file or in the file for Safway Services, LLC, BSS's immediate predecessor. (ECF No 43-5 at 30-31.) And Daly testified multiple times that, as Local 169's longtime business manager, he did not know of any written document indicating a contract between Local 169 and BSS "or any prior iterations." (*Id.* at 3, 8, 30-31.) The only documents in Safway Services, LLC's file at the time were "correspondence letters back and forth" and documents concerning the Barrick site extension request from 2005. (*Id.* at 30-31, 48 at 5.) During his deposition, Daly also testified that he knew the contents of the file for Safway Services, LLC, but not for Safway Steel Products—folders likely kept next to each other if in alphabetical order. (ECF No. 43-5 at 30-31.) Thus, Daly's explanation is unpersuasive in terms of establishing the authenticity and trustworthiness of this document.

Further, the record appears to belie Local 169's argument that BSS is undoubtedly a successor of Safway Steel Products, the company that signed the 1969 Short Form Agreement. To be sure, the record shows that in 2009 "Safway Steel Products Inc.," registered in Delaware, eventually became "Safway Services, Inc.," BSS's immediate predecessor. (ECF No. 42-1 at 97-98.) And, like BSS today, Safway Steel Products specialized in scaffolding, as evidenced by the letterhead on the 1969 Short Form Agreement. (*Id.* at 83-84.) However, the record also shows that BSS's predecessor changed its name from "Fred Perry Sportswear Inc." to "Safway Steel Products Inc." in 1994. (*Id.* at 97.) The record does not account for any changes in company ownership or name before 1994. (*Id.*) Given these inconsistencies, Local 169 has not established that BSS went by "Safway Steel Products" since 1969. In sum, the Court finds that Local 169 has failed to establish that the 1969 Short Form Agreement is admissible as a business record under Rule 803(6). The Court instead deems the 1969 Short Form Agreement inadmissible hearsay and will therefore not consider it for summary-judgment purposes.

### B.    Whether a Contract Exists between Local 169 and BSS's predecessors

With the evidentiary issues resolved, the Court must now determine whether a valid contract exists between BSS and Local 169 outside of the 1969 Short Form Agreement. Local 169 argues that there is a binding LMA between the parties because: (1) BSS hired Local 169 members under an existing LMA for the Barrick and Valmy projects between 2005 and 2009; (2) BSS recommitted itself to an LMA by failing to respond to Local 169's written notices; and (3) BSS failed to properly terminate the LMA in accordance with the agreement's terms. (ECF Nos. 42 at 14-21.) The Court addresses each argument in turn after first describing the applicable contract law.

"The existence of a contract is a question of law." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1245-46 (D. Nev. 2016), *appeal dismissed*, Case No. 16-16542, 2017 WL 3923364 (9th Cir. Mar. 20, 2017) (citations omitted). Principles of state contract law

typically govern the construction and enforcement of contracts. *See O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (citations omitted). The parties appear to presume that the LMA is governed by Nevada law; the Court agrees because Nevada has the most substantial relationship any potential LMA. *See Progressive Gulf Ins. Co. v. Faehnrich*, 327 P.3d 1061, 1063-64 (Nev. 2014) ("Nevada tends to follow the Restatement (Second) of Conflict of Laws (1971) in determining choice-of-law questions involving contracts[.]") (citations omitted).

Formation of a valid contract requires "an offer and acceptance, a meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005) (footnote omitted). A meeting of the minds is "evidenced by a manifestation of mutual intent to contract." *Shaw*, 201 F. Supp. 3d at 1245 (citations and quotation marks omitted). "Acceptance by silence is exceptional," however, but may occur when an offeree "silently t[akes] benefits" from the offeror or where the offeree "manifest[s] an intent that its silence c[an] operate as an acceptance*." Metro Acquisitions, LLC v. Sunset III, LLC*, Case No. 2:08-cv-00524-RCJ-LRL, 2009 WL 10709707, at *5 (D. Nev. May 19, 2009) (citation omitted). And the party asserting the existence of a contract has the burden to establish the contract's existence and its terms. *See Shaw*, 201 F. Supp. 3d at 1246 (citations omitted).

Because Local 169 argues that there is a binding LMA between the parties, Local 169 has the burden to establish that such a valid LMA exists.[8] (ECF Nos. 42 at 12-21, 47 at 3-7, 49 at 2-9.) *See also Shaw*, 201 F. Supp. 3d at 1246.

///

///

///

---

[8]Local 169 argues that BSS is the successor of "Safway Steel Products, Inc.," "Safway Services, Inc.," "Thyssenkrupp Safway, Inc.," and "Safway Services, LLC." (ECF Nos. 42 at 12-21, 47 at 3-7, 49 at 3-9.) However, the Court does not need to address this issue of successorship liability because it finds that there is no valid contract between Local 169 and BSS's predecessors to begin with.

1

2

          **1.**      **Whether BSS was bound to an LMA when it dispatched Local 169 members for projects between 2005 and 2009**

3         Local 169 first argues that BSS has been bound by an LMA "since at least March

4  2006," when BSS hired Local 169 members to the Barrick and Valmy projects in

5  Northern Nevada. (ECF No. 42 at 7, 15, 17-18.) BSS counters that it hired Local 169

6  members for these two projects under the NMA with LiUNA, not an LMA with Local 169.

7  (ECF Nos. 43 at 4, 43-3 at 10-11, 45 at 14-15.) Both parties rely on the same site

8  extension requests and trust fund contribution documents for the Northern Nevada

9  projects to support their respective arguments. (ECF Nos. 42 at 14-15, 43 at 4, 12-13, 45

10  at 14-16, 48 at 6, 49 at 18-19.) As further explained below, the Court does not find that

11  BSS is bound by an LMA.

12         Indeed, to the contrary, the undisputed evidence before the Court shows that

13  Local 169 members were hired under the NMA. The parties do not dispute the fact that

14  LiUNA denied BSS's site extension request for the Barrick project on March 29, 2005,

15  "due to [the] contractor not returning a signed [ ] Agreement." (ECF No. 42-1 at 75.)

16  LiUNA then directed BSS to contact LiUNA if it "still wish[ed] to become signatory to the

17  NMA." (*Id.*) One year later, however, LiUNA approved BSS's site extension request for

18  25 Local 169 members at Valmy on March 14, 2006. (ECF No. 45-3.) Both site extension

19  requests show that the NMAPC "awarded" contracts for both projects. (ECF Nos. 42-1 at

20  75, 45-3.)

21         Local 169 also relies on LiUNA's 2005 denial of the Barrick site extension request

22  as proof that BSS was bound by an LMA, not the NMA. (ECF No. 42 at 14-15.) But the

23  Court is unpersuaded. The record shows that the NMA governed the work performed by

24  Local 169 members at the Barrick and Valmy projects starting March 2006. The

25  "contractor's card" for BSS shows that Local 169 dispatched 137 members for both

26  projects from March 2006 through October 2008. (ECF No. 42-1 at 38-44.) Local 169

27  members did not work at Barrick until April 5, 2006, after BSS became a signatory to the

28  NMA with LiUNA and gained LiUNA's approval for the Valmy project. (ECF Nos. 42-1 at

42, 45-3.) Local 169 offers no admissible evidence indicating that it dispatched these workers under a valid LMA with BSS.

Additionally, trust fund contribution documents further support BSS's argument that the NMA with LiUNA governed Local 169's work at both Barrick and Valmy since March 2006. The trust fund report for March 2006 and April 2006 shows that BSS made trust fund contributions for the labor of 18 Local 169 members at both sites. (ECF No. 42-1 at 48-49.) Notably, the trust fund report has "Nat'l Maintenance Agmt" handwritten near the top of both pages. (*Id.*) The trust fund reports from August 2006 through December 2006 also indicate the NMA—typed or handwritten as "Nat'l Maintenance Agmt"—is the governing agreement (*Id.* at 50-54.) Similarly, the trust fund reports for April 2007, July 2007, August 2007, December 2008, and January 2009 also indicate that BSS is bound to the NMA for its hiring of Local 169 Members.[9] (*Id.* at 55-56, 62-63.) Thus, the undisputed record shows that the NMA governed the relationship between the parties.

Lastly, the record does not show that the Nevada AGC or any other third party had authority to enter into an LMA or bargain on BSS's behalf between 2005 and 2009. Indeed, Local 169 offers no evidence showing that BSS was a member of the Nevada AGC or gave the Nevada AGC proxy authority to bargain on its behalf. In fact, Local 169 "does not contend" that BSS "is a member of [the Nevada AGC]" or "authorized [the Nevada AGC] to negotiate on its behalf" at any time. (ECF No. 43-17 at 10-11.)

In sum, Local 169 fails to show that BSS was bound by an LMA with Local 169 for work performed at the Barrick and Valmy sites. The Court instead finds that BSS hired

---

[9]The trust fund report for May 2006 shows that BSS made contributions for the labor of 22 Local 169 members for both sites. (ECF No. 42-1 at 45-47.) The report suggests that a specific agreement governed the trust fund contributions, but the name of the agreement is illegible due to the poor quality of the photocopy. (*Id.*) The trust fund reports for May 2007, June 2007, September 2007, October 2007, April 2008, May 2008, and October 2008 do not indicate any governing agreement for the BSS's contributions. (*Id.* at 57-61, 64-65, 66-68.) Without more evidence, the Court cannot conclude from the record whether BSS made contributions under an LMA or the NMA for these months.

1    Local 169 members under the NMA, not an LMA, for the work performed from March

2    2006 until early 2009.

### 2. Whether BSS bound itself to an LMA or successor LMA by not responding to Local 169's 2008, 2011, 2013, and 2015 letters

Next, the Court must determine whether BSS bound itself to an LMA with Local 169 by not responding to Local 169's letters in 2008, 2011, 2013, and 2015. Local 169 argues that BSS recommitted itself to successor LMAs because it "never responded [to any of the five letters] denying it was not a signatory contractor" and knew its silence would serve as a recommitment. (ECF No. 42 at 18-21.) BSS counters that its lack of response does not bind it to any LMA because there was no valid preexisting LMA to begin with and no third party could contract or negotiate on BSS's behalf. (ECF Nos. 43 at 10-11, 45 at 17-18, 48 at 3, 7.) The Court agrees with BSS.

In 2008 and 2011, Local 169 sent letters to "[a]ll contractors signatory to the Laborers' Master Agreement," providing written notice about upcoming wage and benefits increases. (ECF No. 42-1 at 86-90, 92-95.) Local 169 appears to have sent these letters to BSS, given BSS's inclusion in the mailing list for each letter. (*Id.* at 90, 95.) Local 169 sent BSS three additional letters in 2011, 2013, and 2015, giving notice of Local 169's intent to re-open multi-employer negotiations under the LMA with the Nevada AGC. (*Id.* at 23-27.) Notably, Local 169 warned in the 2011 and 2013 letters that "[t]his notice to negotiate . . . does not terminate [the signatory contractor's] obligations under this agreement or any successor to this agreement." (*Id.* at 23, 25.) In the 2015 letter, Local 169 warned BSS that its "acquiescence by virtue of this notice shall constitute an affirmative act of recommitment to multi-employer bargaining, binding your company to the terms of any successor agreement . . ." (*Id.* at 27.)

Even assuming BSS received all five letters, the Court does not find that an LMA binds the parties. First, Local 169 does not show that BSS was already bound to a preexisting LMA with Local 169 before receiving the letters in 2008, 2011, 2013, and 2015. If anything, the trust fund reports and site extension requests show that BSS was

1   bound to the NMA with LiUNA for earlier work at the Barrick and Valmy projects. (ECF

2   Nos. 42-1 at 42-43, 45-47, 48-49, 50-54, 55-56, 62-63, 79-81, 45-3.) Second, the Court

3   finds that the Nevada AGC had no authority to negotiate or enter a labor contract on

4   BSS's behalf. Local 169 fails to establish that BSS was a member of the Nevada AGC

5   before July 2008—when Local 169 sent its first notice letter to LMA signatories—or that

6   BSS granted the Nevada AGC authority to negotiate or enter an LMA with Local 169 on

7   its behalf. Indeed, Local 169 "does not contend" that BSS "is a member of [the Nevada

8   AGC]" or "authorized [the Nevada AGC] to negotiate on its behalf" at any time. (ECF No.

9   43-17 at 10-11.)

10      In sum, while Local 169 warned BSS that its inaction as to each letter would

11  constitute a recommitment to the LMA, Local 169 fails to show that there was a

12  preexisting LMA binding BSS in the first place. The Court accordingly finds that BSS did

13  not bind itself to an LMA with Local 169 after failing to respond to Local 169's notice

14  letters in 2008, 2011, 2013, and 2015.

15      **3.    Whether BSS bound itself to an LMA with Local 169 in 2018**

16      Finally, Local 169 argues that the 2018 correspondence between BSS and Local

17  169 formed a valid contract between the parties. (ECF No. 49 at 19-21.) Again, the Court

18  is unpersuaded.

19      Local 169 sent BSS two letters in 2018, dated May 11 and May 18, 2018. (ECF

20  No. 42-1 at 29, 31.) In its May 11 letter, Local 169 gave BSS written notice of its intent

21  "to open multi-employer negotiations for a successor agreement," as required under

22  "Section 39 of the existing Laborers' Master Agreement in effect" between the parties.

23  (*Id.* at 29.) The successor LMA was set to begin after July 15, 2018. (*Id.*) As in previous

24  letters, Local 169 stated that BSS's "acquiescence by virtue of this notice shall constitute

25  an affirmative act of recommitment to multi-employer bargaining, binding your company

26  to the terms of any successor agreement." (*Id.*) On May 18, Local 169 followed up to

27  reschedule the first negotiation concerning the alleged successor LMA. (*Id.* at 31.)

28

On June 1, 2018, BSS sent Local 169 a response letter confirming receipt of Local 169's letters about the negotiations while "declin[ing] to recognize or bargain with the union for any successor agreement." (ECF No. 43-20 at 2.) In declining to bargain with Local 169, BSS explained that it "ha[d]n't employed members of Local 169 for several years" and that its Salt Lake City office—the address Local 169 had on file—"ceased operations and permanently closed" in November 2017. (*Id*.) BSS also stated that it "does not authorize any third party, such as a multi-employer bargaining representative or association, to bargain or enter into any agreements on [BSS's] behalf." (*Id*.)

Considering this evidence, the Court finds that an LMA did not exist between BSS and Local 169 before May 2018. The record shows that the only agreement that bound BSS at that time was the NMA with LiUNA, not Local 169. (ECF No. 43-13 at 2.) The Court accordingly cannot conclude that BSS recommitted itself to a successor LMA in 2018. The Court is instead persuaded by BSS's argument that, "[o]ut of an abundance of caution," it clearly and repeatedly repudiated any LMA with Local 169. (ECF Nos. 42-1 at 5, 43-20 at 2, 43-21 at 2, 43-22 at 2.)

Alternatively, because no evidence indicates that BSS hired any Local 169 members since 2008, the Court finds that BSS properly terminated any potential agreement under the "one-employee unit rule." *See Laborers Health & Welfare Tr. Fund v. Westlake Dev.*, 53 F.3d 979, 982 (9th Cir. 1995) (describing the rule). The "one-employee unit rule" provides that a construction industry employer who employs no more than a single employee (or none at all) under a Section 8(f) pre-hire agreement may repudiate the agreement by conduct sufficient to put the union and the employee on notice that the agreement has been terminated. *Id.* (citation omitted); *see also Howard S. Wright Constr. Co. v. Laborer's Int'l Union of N. Am., Loc. Union No. 169*, Case No. 3:06-cv-00456-BES-RAM, 2007 WL 9728820, at \*3-\*4 (D. Nev. July 25, 2007) (recognizing the "one-employee unit rule" as such). The record shows that BSS had not employed any Local 169 members since 2008 and very clearly repudiated any potential agreement

with Local 169 as early as 2018. (ECF Nos. 42-1 at 21, 35-36, 43-20 at 2, 43-21 at 2-3, 43-22 at 2.) Thus, BSS properly terminated any potential agreement under the "one-employee unit rule."

To summarize, Local 169's arguments as to why it is entitled to summary judgment are unpersuasive. Local 169 relies upon the incorrect premise that BSS was bound to a preexisting LMA. To the contrary, BSS was not bound to any LMA with Local 169 but was instead bound to the NMA with LiUNA for past work performed at Barrick and Valmy. Moreover, because Local 169 has not established a valid preexisting contract between the parties, BSS did not bind itself to any successor LMA by failing to respond to Local 169's multi-employer bargaining letters in 2008, 2011, 2013, and 2015. Nor did BSS grant any third party authority to enter an LMA or negotiate on its behalf. The Court will therefore grant BSS's Motion, deny Local 169's Motion, and direct the entry of judgment in BSS's favor, because there are no other issues for the Court to resolve in this case.

V.     CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

///

///

///

///

///

///

///

///

1

2

It is therefore ordered that Defendant Laborers' International Union of North America, Local 169's motion for summary judgment (ECF No. 42) is denied.

3

4

It is further ordered that Plaintiff Brandsafway Services, LLC's motion for summary judgement (ECF No. 43) is granted.

5

6

The Clerk of Court is directed to accordingly enter judgment in Plaintiff's favor and close this case.

7

8

DATED THIS 29th Day of September 2022.

9

10

_____

11

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28